Wanchai PETERSON, Plaintiff,

v.

GREAT HAWAIIAN CRUISE LINE, INC., dba American Hawaii Cruises; In Personam and S.S. Independence, In Rem, Defendants.

No. CV 97–00323 DAE.

United States District Court, D. Hawaii.

Apr. 28, 1998.

Jay L. Friedheim, Honolulu, HI, John R. Remis, Jr., Honolulu, HI, for Wanchai Peterson, plaintiff.

John R. Lacy, Goodsill Anderson Quinn & Stifel, Honolulu, HI, for Great Hawaiian Cruise Line, Inc., defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID ALAN EZRA, District Judge.

The above-entitled action came before this court for non-jury trial on April 15–16, 1998. John R. Remis, Jr., Esq., and Jay Lawrence Friedheim, Esq., represented Plaintiff Wanchai Peterson. Normand R. Lezy, Esq., and John R. Lacy, Esq., represented Defendant Great Hawaiian Cruise Line, Inc., dba American Hawaii Cruises, and S.S. INDEPENDENCE. This court, having considered the evidence adduced by the parties, the arguments and memoranda of counsel, and the record herein, makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

I. *Parties.*

1. Plaintiff WANCHAI PETERSON ("Plaintiff") is a citizen and resident of the State of Hawaii. On the morning of April 5, 1997, Plaintiff was employed by Defendant GREAT HAWAIIAN CRUISE LINE, INC., dba AMERICAN HAWAII CRUISES ("Defendant"), and was working aboard the S.S. INDEPENDENCE as an ordinary seaman.

2. Defendant owns and operates the S.S. INDEPENDENCE as a cruise ship.

II. *Procedural History.*

3. All relevant events took place aboard the S.S. INDEPENDENCE while it was coming into port at the Port of Honolulu, the Island of Oahu, State of Hawaii.

4. Plaintiff filed his Complaint against Defendant on April 15, 1997, alleging claims under the Jones Act, 46 U.S.C. App. § 688, and general maritime law causes of action for unseaworthiness, maintenance and cure, found and lost wages.

III. *Facts Surrounding the April 5, 1997 Accident.*

5. On April 5, 1997, Plaintiff began his shift at midnight as an ordinary seaman in the maintenance department.

6. On the morning of April 5, 1997, in his capacity as an ordinary seaman in the maintenance department, Plaintiff was instructed to assist the others in his department with the stringing of the decorative flags as the S.S. INDEPENDENCE sailed into port at Honolulu, Hawaii.

7. The task of stringing the decorative flags was done under the supervision of Barry Fuller, the Boatswain's Mate.

8. Plaintiff had never before assisted or in any way performed the task of stringing the decorative flags, however, it was a task completed every Saturday as the vessel arrived in Honolulu.

9. Plaintiff was attempting to string the decorative flags and to receive the flag line from Fahd Saleh, a member of the crew. In doing so, Plaintiff stood atop a hatch cover on the bow of the vessel.

10. The hatch cover is raised approximately four (4) feet above the deck of the vessel.

11. The Boatswain's Mate, Barry Fuller, realized that it was impossible for Plaintiff to receive the line from Fahd Saleh while Plaintiff was standing on the hatch cover.

12. The Boatswain's Mate then ordered Plaintiff to get down from the hatch cover so that he could climb the kingpost ladder in order to obtain the flag line from Fahd Saleh.

13. A stack of wooden pallets was being stored on the bow adjacent to the hatch cover. These wooden pallets were not used during the cruise, but were instead left over from when the vessel was in drydock.

14. The wooden pallets were not tied down, and were stacked to reach a height that was a little lower than that of the hatch cover.

15. Plaintiff stepped down onto the pallets with his left foot. The wooden pallets flipped because of the weight of Plaintiff, and Plaintiff fell from the pallets due to the unsteadiness. Plaintiff landed on his back onto the deck of the vessel.

16. The Boatswain's Mate did previously instruct Plaintiff to get down from the hatch cover, however he did not instruct him to use the pallets as a step down to the deck.

17. There were no signs or other warnings on the wooden pallets at the time of the accident that could have alerted Plaintiff or others that the wooden pallets were unsafe.

18. Plaintiff did not use the pallets to get onto the hatch cover. In fact, Plaintiff pushed himself up onto the hatch cover in the same manner that one would get out of a swimming pool without using the stairs.

19. At the time of the accident Plaintiff believed that the wooden pallets were garbage that should not have been on the deck.

20. There were other avenues by which Plaintiff could have taken to descend from the hatch cover to the deck.

IV. *Unseaworthiness of the S.S. INDEPENDENCE.*

21. The bow deck of the S.S. INDEPENDENCE, at the time of the accident, was unseaworthy.

22. The wooden pallets stored adjacent to the hatch cover had not been used since drydock, and were not stored in a safe condition.

23. The failure to remove, or properly store the wooden pallets created an unsafe and unseaworthy condition on the deck of the S.S. INDEPENDENCE.

V. *Defendant's Negligence.*

24. Defendant was negligent in allowing the wooden pallets to remain unattended and in an unsafe condition. Defendant knew or should have known of the negligent condition of the bow.

25. The failure to remove, to place warning signs, or in some way alert those on the vessel of the dangerous condition created by the wooden pallets was negligent.

VI. *Plaintiff's Physical Injuries and Medical Treatment.*

26. Immediately after the fall Plaintiff noticed that his right hand was hurt, and that his right leg was scratched.

27. After his shift on April 5, 1997, Plaintiff went to see the ship's doctor regarding the injuries that he sustained from the fall. Again, on April 6, 1997, Plaintiff went to see the ship's doctor, and indicated that his left hip had also begun to hurt.

28. When the vessel docked in Maui on April 6, 1997, Plaintiff was taken to Wilcox Memorial Hospital emergency.

29. Plaintiff was told that he could not remain on the ship because of his injuries, and he was flown to Honolulu, Hawaii, with a referral to Straub Clinic and Hospital.

30. Plaintiff was seen at Straub Clinic and Hospital from April 9, 1997, through May 30, 1997. During this time Plaintiff underwent physical therapy to aid in the treatment of his injuries.

31. Plaintiff began treatment with Bernard Portner, M.D. in June 1997, and continued such treatment through April 1998.

32. Plaintiff's injuries to his lower back and his left hip were caused by the April 5, 1997 accident on the S.S. INDEPENDENCE.

33. On January 8, 1998, Dr. Portner indicated that Plaintiff could return to work.

34. Thereafter, Plaintiff submitted his card at the union, and applied for work aboard a ship. As of the date of this trial, Plaintiff had not been offered work aboard a ship.

35. On March 17, 1998, Plaintiff was seen by Dr. Portner, and Dr. Portner's report explains that Plaintiff was 80% to 85% better. Dr. Portner again indicated that Plaintiff could return to work.

■ 36. At trial, Dr. Portner testified that after examining Plaintiff on April 8, 1998, he believes Plaintiff is permanently and totally disabled to perform work as an ordinary seaman. Dr. Portner's testimony in this regard was based in large part on Plaintiff's own subjective reports of his condition to Dr. Portner. Plaintiff also testified that his condition had worsened and that he was unable to perform work or other physical activities that he once could. The court finds this testimony is not credible given the reports previously provided by Dr. Portner indicating that Plaintiff had improved and was 85% better just one month before. Therefore, in light of all of the evidence adduced at trial, the court finds that Plaintiff was fit for duty as of January 8, 1998, and is not permanently and totally disabled to perform the work of an ordinary seaman.

## VII. Maintenance and Cure.

37. Defendant paid Plaintiff $8 per day as maintenance pursuant to the collective bargaining agreement. Defendant's responsibilities as to payment of maintenance have been discharged.

38. While Plaintiff testified that Defendant agreed to pay a higher maintenance amount, the court finds that the evidence that such a contract existed is not credible. Furthermore, the court finds that there is no consideration to support the existence of such a contract.

39. Plaintiff is entitled to payment of all cure-related medical bills for medical services up through the date of trial, relating to Plaintiff's injuries. It has been represented to the court that there is an outstanding medical bill at Straub Clinic & Hospital in the amount of $1,075.20 for which payment was denied on July 14, 1997.[1] It has also been represented to this court that this bill relates solely to the medical treatment provided because of the injuries sustained by Plaintiff on April 5, 1997. Based upon this information,

---

1. On April 27, 1998, Defendant filed a Response to Plaintiff's Supplement to Final Argument Re Damages. Defendant explains that after receiving Plaintiff's memorandum regarding the delinquent Straub Clinic & Hospital bill, Defendant's counsel contacted Ms. Rosa Seward, a Manager of Business Services for Straub Clinic & Hospital. Ms. Seward is the individual that controls the billing procedures for the hospital. Ms. Seward confirmed that the bill was denied on July 14, 1997, however, it was denied by Plaintiff's union's medical benefits provider, and not by Defendant. In fact, the bill was never submitted by Straub Clinic & Hospital to Defendant, and was instead sent directly to Plaintiff after the denial. Defendant represents that Plaintiff never submitted the bill to it for payment, and thus Defendant was unaware that the bill existed. Arrangements have since been made to have the billing statement forwarded to Defendant for payment.

the court finds that Defendant is required to make payment to Straub Clinic & Hospital as part of the cure-related payments of medical expenses.

## VIII. General Damages.

40. Plaintiff is entitled to an award of general damages for his past pain and suffering.

41. Plaintiff was unable to work or perform any extracurricular activities such as weight lifting or boxing for a period of nine months, because of the injuries and the pain sustained as a result of the accident on April 5, 1997.

42. Plaintiff testified that he suffered from a high level of pain during the initial stages of his treatment, which fluctuated throughout. the remainder of his treatment.

43. Plaintiff underwent painful sessions of physical therapy as well as painful injections into his back and buttocks.

44. The court finds that based upon this pain and suffering, an award of $38,000 is just and reasonable.

45. The court does not make a monetary award for future pain and suffering as the court finds that Plaintiff was declared fit for duty in January 1998, and because the pain suffered by Plaintiff is no more than the average discomfort felt by the average person of like age.

## IX. Special Damages—Lost Wages.

46. Plaintiff was unable to work for approximately nine months, April 5, 1997 through January 8, 1998, when Plaintiff was declared fit for duty.

47. Prior to the accident, Plaintiff worked for Defendant for a period of approximately 63 days in the year 1997.

48. In 1996, Plaintiff's income tax return shows income in the amount of $5,792, and only $996.18 of that amount was paid to Plaintiff by Defendant. During the year 1996, Plaintiff was employed by two other employers.

49. In 1995, Plaintiff's income tax return shows income in the amount of $7,068. During the year 1995, Plaintiff was not employed by Defendant. Plaintiff received $2,500 of unemployment compensation during that year, and the remainder of the income was paid by a single employer.

50. In 1994, Plaintiff's income tax return shows income in the amount of $5,349. Plaintiff was employed by Defendant, and was paid a total of $3,474. The remainder of the income for the year 1994 was paid by two other employers.

51. Based upon the above, Plaintiff's work history is sporadic. Over the past four years, Plaintiff has worked for several different employers, and has not consistently held one job for the entire year.

52. Because of Plaintiff's employment record, the court concludes that it is unlikely that Plaintiff would have continued working for Defendant, without break, for the remainder of 1997.

53. Given the totality of the circumstances, the court awards to Plaintiff the amount of $5,362.72 in lost wages for the 277 day period between April 5, 1997 and January 8, 1998. This award is based upon a finding by the court that in 1997 Plaintiff had already received more income by working for Defendant than he had from a single employer in any other year. This represents a possible change in Plaintiff's employment record. However, the court is hesitant to make a finding that such employment would have continued throughout the year. Thus, the court looked at Plaintiff's income from the year 1995, the year in which he received the most income, $7,068, and divided $7,068 by 365, the total number of days in a year ($7,068 + 365 = $19.36). The court then multiplied $19.36 by 277, representing the number of days Plaintiff was unable to work, which results an award of $5,362.72.

54. The court does not make an award of future lost wages because based upon the record, the court finds Plaintiff is currently able to resume like employment.

## CONCLUSIONS OF LAW

### A. Unseaworthiness.

■ A shipowner has the absolute duty to furnish a seaworthy ship. *Mitchell v.*

*Trawler Racer, Inc.* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *see also Ribitzki v. Canmar Reading & Bates,* 111 F.3d 658, 664 (9th Cir.1997). A seaworthy ship is one which is "reasonably fit" for its intended use. *Ribitzki,* 111 F.3d at 664. To establish a claim for unseaworthiness, a plaintiff must show:

> (1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries.

*Id.*

There is no question that the warranty of seaworthiness extends to Plaintiff, an ordinary seaman on the S.S. INDEPENDENCE. Furthermore, Plaintiff's injuries were caused by the wooden pallets which became part of the ship when they were placed on the bow. Additionally, the court finds that the third and fourth prongs of the unseaworthiness test are also met here. The fact that the wooden pallets were placed next to the hatch cover, and left there since drydock without warning signs or rope created an unseaworthy condition on the bow of the ship. The wooden pallets should have been properly stowed or taken off the ship, the placement of the unstable and dangerous wooden pallets on the bow, made the vessel not reasonably fit for its purpose. Finally, the unseaworthy condition proximately caused Plaintiff's injuries.

**B.** *Negligence.*

To recover for negligence under the Jones Act, a plaintiff must establish by a preponderance of the evidence:

> (1) negligence on the part of his employer (or one for whom the employer is responsible), and (2) that the negligence was a cause, however slight, of his injuries.

*Havens v. F/T Polar Mist,* 996 F.2d 215, 218 (9th Cir.1993). A plaintiff also must demonstrate that the owner of the vessel knew, or

in the exercise of reasonable diligence, should have known of the unsafe condition. *Id.* "The quantum of evidence required to support a finding of negligence under the Jones Act is lower than that which is required for common law negligence," even the slightest negligence is sufficient under the Jones Act. *Ward v. American Hawaii Cruises, Inc.* 719 F.Supp. 915, 922 (D.Haw.1988).

In the instant case, Plaintiff met his burden. It was negligent for Defendant to allow a stack of wooden pallets, without warning signs or ropes, to be left next to the hatch cover of the ship where Plaintiff was forced to work. The wooden pallets were not in use on the vessel, in fact they were left over from drydock and had not been used for months. The Plaintiff used the wooden pallets as a "step" as he was getting down from the hatch cover. Thus, the negligence of Defendant caused Plaintiff's injuries. The fact that the wooden pallets were not properly stowed, and were in plain sight for months demonstrates that Defendant knew or should have known of the negligent condition.

**C.** *Comparative Fault.*

In admiralty, contributory negligence does not "wholly bar an injured person from recovery." *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 408–09, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *see also Socony–Vacuum Oil Co. v. Smith,* 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265 (1939).[2] Contributory negligence is instead considered in mitigation of damages. *Id.* at 409, 74 S.Ct. 202. Significantly, state law cannot deprive an injured person of this admiralty principle. *Id.* at 410, 74 S.Ct. 202. The defense of contributory negligence requires evidence of some negligent act by the plaintiff. *Tolar v. Kinsman Marine Transit Co.,* 618 F.2d 1193, 1196 (6th Cir.1980). The question would be whether the plaintiff created an "unreasonable" risk of injury to himself. A seaman "is obligated under the Jones Act to act with ordinary prudence under the circumstances." *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d

---

**2.** The Ninth Circuit has also indicated that, "[t]he general rule in personal injury actions brought in admiralty ... is that contributory negligence is not a complete bar to recovery but

it does operate to reduce the amount of the damage award." *Kopczynski v. The Jacqueline,* 742 F.2d 555, 558 (9th Cir.1984).

331, 339 (5th Cir.1997). The standard that the plaintiff is held to is one of a reasonable seaman in like circumstances. *Id.*

■ While the court believes that it was negligent to allow the wooden pallets to remain next to the hatch cover without warning signs and without being tied down, the court also finds that Plaintiff was negligent in using them as a step. Plaintiff was ordered down from the hatch cover, but he was not ordered to step onto the wooden pallets. Plaintiff testified that he believed the wooden pallets were garbage that should have been cleared from the bow. It was not his responsibility to safely stow the wooden pallets, but he is required to act as a reasonable seaman, relying on his experience and common sense. Plaintiff testified that he did not use the wooden pallets to get onto the hatch cover, and that he merely pushed himself up onto it. Thus, there was at least one other avenue that Plaintiff could have used to get down from the hatch cover onto the deck.

Given Plaintiff's belief that the wooden pallets were garbage, and that they were not supposed to be on the deck, and given that Plaintiff was able to get onto the hatch cover without the assistance of the wooden pallets, the court finds that by using the wooden pallets to aid his descent down from the hatch cover. Plaintiff placed himself in an unreasonable risk of danger. Plaintiff did not act in accordance with his experience as an ordinary seaman. Nevertheless, considering the time pressures placed on Plaintiff while stringing the flags, and the fact that Plaintiff had never before worked on the bow, the court finds Plaintiff was fifteen percent (15%) comparatively at fault for his April 5, 1997 accident. Thus, the damage award shall be reduced accordingly.

D. *Maintenance.*

■ The court finds that Defendant discharged its obligations to pay maintenance at the rate set forth in the collective bargaining agreement, $8 per day.

Plaintiff insists that he is entitled to additional maintenance payments because the rate set by the collective bargaining agreement is only a baseline. The Ninth Circuit in *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943, 948 (9th Cir.1986), held that maintenance rates expressed in collective bargaining agreements should be enforced. Therefore, this court declines to speculate as to the sufficiency of the bargained-for maintenance rate, and enforces the $8 per day rate established by the collective bargaining agreement.

E. *Enhanced Maintenance.*

■ Plaintiff asserts that he entered into an oral contract with Defendant for an enhanced maintenance rate of the $8 per day, along with 60% of his income during the period of his rehabilitation. Plaintiff made such an assertion, but did not properly demonstrate the consideration for such a contract. The evidence of the oral contract offered by Plaintiff is weak. Plaintiff merely testified that "Flo," a representative of Defendant, told him that she would talk to Scott Higashi in order to aid Plaintiff because he was financially strapped. Additionally, Plaintiff testified that "Flo" never explained that she had the authority to make such an offer, only that Scott Higashi was the individual that could do so. Plaintiff presented no evidence that there was true bargaining, nor that there was consideration for such a statement or alleged offer.

Furthermore, for the court to recognize the existence of such a contract, the court would have to assume that Plaintiff has the ability to alter or modify the collective bargaining agreement as it pertains to him. There is no factual or legal arguments that support this position. The court does not believe that an oral contract for enhanced maintenance was agreed to by the parties.

F. *Found.*

■ Plaintiff argues that based upon the facts, a recovery for "found" is required from the date of the accident through May 21, 1997, when the first payment for maintenance was issued by Defendant. Recovery for "found" is only appropriate after maximum cure has been achieved. The Fifth Circuit explained that "payments for meals before maximum cure has been achieved can often be regarded as part of maintenance, any

award for loss of future fringe benefits after maximum cure has been achieved, and the duty to pay maintenance has therefore ended, can only constitute the oft-overlooked award in admiralty for 'found.'" *Pickle v. International Oilfield Divers, Inc.*, 791 F.2d 1237, 1242 n. 6 (5th Cir.1986).[3]

▆ Plaintiff's request for found during the period of delay when maintenance was not immediately paid, would allow Plaintiff an award of double recovery for that period. Plaintiff was paid maintenance during that time, albeit not immediately, and an award of found during the same period is not appropriate. *See supra* note 3. Although there may have been a delay between April 5, 1997 to May 21, 1997, in the payment of maintenance to Plaintiff, Plaintiff is not entitled to an award of found during that period. Additionally, an award of found is improper on these facts, even for the period after which maintenance payments ceased, as Plaintiff was declared fit for duty on January 8, 1998, and is not permanently disabled. Thus, the court declines to award Plaintiff any amount for found.

## G. *Cure.*

Plaintiff presented the court with an affidavit explaining that Defendant had failed to pay Plaintiff's medical bill at Straub Clinic & Hospital for treatment relating to the April 5, 1997 accident. The court finds that, as it has been represented to the court by stipulation and at trial, Defendant has paid Plaintiff's cure-related medical expenses as required by the law. If the bill at Straub Clinic & Hospital is outstanding, Defendant is ordered to immediately make payment.

## H. *Pre–Judgment Interest.*

▆ In admiralty cases whether to award "pre-judgment interest is within the discretion of the trial judge." *Western Pacific Fisheries, Inc. v. SS PRESIDENT GRANT*, 730 F.2d 1280, 1288 (9th Cir.1984).

The court's "discretion must be exercised with a view to the fact that pre-judgment interest is an element of compensation, not a penalty." *Id.* Title 28, section 1961(a) is "appropriate for fixing the rate for prejudgment interest unless the equities of a particular case demand a different rate." *Columbia Brick Works Inc. v. Royal Ins. Co. of America*, 768 F.2d 1066, 1071 (9th Cir.1985).

▆ Pre-judgment interest is awarded to Plaintiff. The rate of the interest is determined by 28 U.S.C. § 1961(a), the Treasury Bill rate on the date of judgment. *See Turner v. Japan Lines, Ltd.*, 702 F.2d 752, 758 (9th Cir.1983) (finding that the applicable pre-judgment interest rate is the statutory rate on the date of judgment). In this case, pre-judgment loss began at the time of the accident, however, it accrued throughout the course of the lawsuit. Thus, in fairness to both parties, the court awards pre-judgment interest from the date of the filing of the Complaint, through the date of judgment.

## I. *Post–Judgment Interest.*

▆ Plaintiff is also awarded post-judgment interest from the date of the judgment until Defendant pays the award. The interest rate for post-judgment interest is governed by 28 U.S.C. § 1961(a). *See Western Pacific Fisheries, Inc. v. S.S. PRESIDENT GRANT*, 730 F.2d 1280, 1289 (9th Cir.1984).

## J. *Attorney's Fees.*

▆ Plaintiff requests an award of attorney's fees based upon the delay in the payment of maintenance and cure, and the need for Plaintiff's counsel to intervene on Plaintiff's behalf to obtain such benefits. First, there is no evidence that Defendant "willfully and persistently" denied Plaintiff payment of maintenance and cure. There was an initial delay in the payment of maintenance, however, there is no evidence that such a delay was an attempt by Defendant to deny payment. Furthermore, while there may be one out-

---

**3.** The Fifth Circuit referred to a law review article clarifying that once a physical disability is declared permanent, there is no longer a claim for maintenance, rather the injured plaintiff's claim for found become viable. Once the plaintiff's claim for maintenance terminates, he may then be entitled to found. There is no double recovery for maintenance and found within the same time period. *See Pickle*, 791 F.2d at 1242 n. 6 (citing Normann, Has Found Been Lost? An Analysis of a Seldom Utilized Concept in the Maritime Law, 30 Loy.L.Rev. 875, 877 (1984)).

standing cure-related medical bill at this time, the Straub Clinic & Hospital bill amounting to $1,075.20,[4] the court has been informed by stipulation that the remainder of the bills were properly paid. This single outstanding bill does not demonstrate bad faith with regard to Defendant's payment of Plaintiff's cure-related medical bills.

To justify an award of attorney's fees for the intervention of counsel to aid in the procurement of maintenance and cure, there must be some finding that Defendant wrongfully withheld payment. *See Tran v. Captain Glyn, Inc.*, 909 F.Supp. 727, 736-37 (D.Haw.1995). In *Vaughan v. Atkinson*, 369 U.S. 527, 533, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the Supreme Court found that attorney's fees incurred in order to secure an award for maintenance and cure may be recovered in addition to medical care, food and lodging. The Ninth Circuit, as well as other circuits, have construed the scope of *Vaughan* as allowing attorney's fees only when the failure to provide maintenance and cure was "arbitrary, recalcitrant or unreasonable." *Kopczynski*, 742 F.2d at 559. In most cases, an award of attorney's fees is based upon the defendant's complete failure to pay maintenance and cure. *Vaughan*, 369 U.S. at 529, 82 S.Ct. 997, *Kopczynski*, 742 F.2d at 559.

Significantly, Defendant here is not guilty of failing to pay maintenance and cure. Plaintiff received his first payment of maintenance on May 21, 1997, approximately a month and a half after the accident. There is no evidence that Defendant denied Plaintiff maintenance and cure. In fact, Plaintiff testified that soon after the accident, in his discussion with "Flo", he was told that he would receive $8 per day during the time he was unable to work. There was no testimony at trial that Plaintiff was ever denied maintenance and cure. To support his contention that attorney's fees should be paid, Plaintiff points to Defendant's Answer to his Complaint which denies that Plaintiff was working at the time of the injury. While this

is certainly inappropriate and untrue based upon the credible evidence before the court, it does not demonstrate that Plaintiff was denied maintenance and cure, and that his attorneys were therefore required to intervene on Plaintiff's behalf. Furthermore, the accident occurred on April 5, 1997, and Plaintiff filed his Complaint on April 15, 1997. Thus, Plaintiff's attorneys were immediately involved in the discussions with Defendant regarding maintenance and cure, whether or not it was necessary for them to be. The facts in the instant case do not amount to a showing that Defendant's actions were arbitrary, recalcitrant or unreasonable, nor do the facts demonstrate that Defendant ever denied the payment of maintenance and cure. Consequently, the court finds that an award of attorney's fees is not appropriate on these facts.

## CONCLUSION

Any findings of fact which should more properly be deemed conclusions of law and any conclusions of law which should more properly be deemed findings of fact shall be so construed.

Pursuant to its findings and conclusions herein, the court hereby orders that judgment be entered in favor of Plaintiff. The damage award shall be reduced by Plaintiff's comparative fault of 15%. The court hereby ORDERS that any and all cure-related medical bills be paid immediately, along with the following monetary awards:

| | | |
|---|---|---|
| Past Pain and Suffering | $ | 38,000.00 |
| Lost Wages | | 5,362.72 |
| Subtotal | $ | 43,362.72 |
| Less 15% Comparative Fault | − | 6,504.41 |
| Total | $ | 36,858.31 [5] |

IT IS SO ORDERED.

---

4. The court notes that it appears that Defendant was never made aware of this bill, and that this is the sole reason for the non-payment.

5. This total does not include the pre-judgment interest that the court has also awarded to Plaintiff as part of this judgment.