Eduardo B. BARLAS, Plaintiff,

v.

**UNITED STATES OF AMERICA,**
Defendant.

**No. 01 Civ. 6420(DC).**

United States District Court,
S.D. New York.

Aug. 18, 2003.

Tabak & Mellusi by Sheldon Tabak, Stephen B. Roberts, New York City, for Plaintiff.

United States Department of Justice, Civil Division Aviation/Admiralty Section by Michelle T. Delemarre, Admiralty Trial Attorney, Washington, DC, for Defendant.

## OPINION

CHIN, District Judge.

On March 17, 2000, seaman Eduardo Barlas tripped on a plastic packing strap on the deck of the S.S. Cape Avinof. Barlas's feet became entangled in the strap while he was carrying two heavy boxes of canned goods, and the fall injured his ankle, knee, and lower back. In this case, Barlas contends that dual defects rendered the Cape Avinof "unseaworthy": the plastic strap was inadequate because it must have slipped off a carton, uncut, and the deck was unsafe because it contained a nearly invisible entanglement hazard.

In the peculiar world of the general maritime law and the "unusual liability" that is unseaworthiness, *Shenker v. United States,* 322 F.2d 622, 630 (2d Cir.1963) (Friendly, J., dissenting), I conclude that the fallen packing strap rendered the Cape Avinof "unseaworthy" and the United States is liable in tort to Barlas for his injuries. Pursuant to Fed.R.Civ.P. 52(a),

my findings of fact and conclusions of law follow.

## FINDINGS OF FACT

### A. *Plaintiff*

Barlas was born on April 2, 1957 in the Philippines, where he worked as a merchant seaman from 1977 until 1984. (Tr. at 11).[1] Barlas came to the United States in December 1985, and after receiving his green card in 1990, he became a nursing assistant. (Tr. at 12). Barlas thereafter became a United States citizen, and in 1995 he obtained his seaman's papers and returned to work as a merchant seaman. (Tr. at 13–14). Since then, he has not worked on shore. (Tr. at 14).

Barlas began work as an "able bodied seaman" or "AB" on the Cape Avinof, a vessel owned by the United States, on March 16, 2000. (Tr. at 14–16, 20–21, 90). As an AB, Barlas worked primarily on the deck, doing "bull work": general deck maintenance such as painting, chipping, and securing gears, work that involved lifting, crawling, and squatting. (Tr. at 16).

### B. *The Accident*

On March 17, 2000, the Cape Avinof was docked at Baltimore, Maryland. (Tr. at 68). At about 3:30 in the afternoon, Barlas followed an order to help two or three others unload pallets containing boxes of the ship's stores (provisions or other items for the ship's own use), located on the starboard side, main deck, next to the number 5 hatch. (Tr. at 20, 30–31, 35; PX 3).

---

1. References to "Tr." are to the trial transcript; references to "PX" and "GX" are to plaintiff's exhibits and the Government's exhibits, respectively. References to "Stip. Facts" are to a stipulation of facts entered into by the parties on December 2, 2002. (Tr. at 8–9).

The unloading of stores is a relatively simple, weekly operation. (Tr. at 72). Pallets containing boxes are lifted by a ship's winch from the back of a truck on the pier onto the deck of the ship. (*Id.*). The pallets' shrink-wrapping is cut away, and individual boxes are picked up and carried into the galley, inventoried, then stored or refrigerated. (*Id.*).

On the day of the accident, Barlas helped to cart the pallets across the deck to the nearest doorway. (Tr. at 30). From there, he was to carry boxes from the pallets and pass them to a man inside the doorway. (Tr. at 31). On his first trip from the back of a pallet to the door of the ship, while carrying two boxes of canned goods, Barlas's feet became tangled in a plastic packing strap. He fell to the deck, twisting his legs, and landed on his knees, still holding the boxes. (Tr. at 32, 34, 50).

Although Barlas was not carrying anything when he first went to the rear of the pallet, he did not see the strap on the deck until after he fell. Neither he nor Chief Mate Bolster, who was involved in the unloading operation, knew where the strap came from. (Tr. at 56–57). The boxes Barlas was carrying did not have packing straps, and the pallets themselves were shrink-wrapped. (Tr. at 54, 74). Some other boxes on the pallets were strapped and some were not. (Tr. at 34, 57). Boxes of frozen seafood had one packing strap around each package. (Tr. at 74).

Extrapolating from Bolster's testimony that the strap likely came from a small box of frozen fish, the Court finds that the plastic strap was somewhere between 14 and 18 inches in length, and approximately 3/8 of an inch wide. (Tr. at 74; PX 16). Although the plastic strap that tripped Barlas was not retained, the Government does not dispute that Barlas tripped on such a strap. (Tr. at 21). A packing strap similar to the one in question, perhaps a little longer (a total of 18 inches), was received in evidence. (Tr. at 74; PX 16).

The Court further finds that the strap fell to the deck from one of the boxes of stores. Indeed, Bolster testified that there was no other possibility. (Tr. at 84; *see* Tr. at 89 (wind theoretically capable of moving the strap)). Similarly, it was unlikely that Barlas was responsible for the strap's presence (although he is partly responsible for failing to see it), as the first and only boxes he lifted did not have any such straps. (Tr. at 52–53). As there was no testimony that any of the crew were engaged in cutting or removing strapping, the Court finds that the strap slipped off one of the other boxes of stores without being cut.

Further, the strap was not on the deck for very long before Barlas tripped on it. There were at least three people, in addition to Bolster, involved in the operation and walking around the area, alert to potential tripping hazards; both Bolster and Barlas agreed they would have picked up the strap if they had seen it. (Tr. at 49, 53–55, 75, 83).

The strap was white; the deck of the Cape Avinof was gray-black, with a nonskid surface. (Tr. at 76; DX 1 (photo); PX 16 (strap)). The strap would have been visible laying on the deck, although by no means as visible as other obstructions. The deck's fixtures included a number of raised, metal D-rings spray-painted yellow. A metal trash can, also painted yellow, was usually placed in the area. (Tr. at 77–78). Any crew member who saw the strap would have been able to dispose of it easily.

C.  *Plaintiff's Injuries and Treatment*

Barlas initially complained of pain in his right ankle and, after being taken to rest inside the ship, pain in his right hip con-

tinuing down into his legs. (Tr. at 18, 20, 33; PX 4). Bolster visited Barlas in his room soon after the accident, and could see a scrape on his knee and swelling at his ankle. (Tr. at 80–81). Barlas was treated at Johns Hopkins Bayview Medical Center, where he was declared unfit for duty, his ankle was splinted, and he was given a crutch. (Tr. at 36, 58; PX 6; Stip. Facts ¶ 12). Barlas complained of back pain and was given medication, but he was not initially treated for a back injury. (Tr. at 58–59).[2]

An MRI of the plaintiff's lumbar spine was taken at Columbia Presbyterian Hospital in New York on March 31, 2000. The MRI showed an L4–5 right-sided herniated disc (herniated nucleus pulposus or HNP), leading to right foraminal stenosis and disc desiccation with small disc bulges at L2–3 and L3–4, but without significant central canal or foraminal stenosis. (Tr. at 95–97; PX 7).[3]

Referred by his lawyer, Barlas consulted Dr. Harold Goldberg, an osteopathic physician, in April 2000. From the radiologist's report and a physical examination, Dr. Goldberg concluded that Barlas suffered from a right L4–5 radiculopathy, or pain radiating from a nerve, and "traumatic derangement of the lumbosacral spine." (Tr. at 97–98, 59, 122; Stip. Facts ¶ 14). Goldberg also found a contusion and sprain of the right hip and a right ankle sprain, and he prescribed physical therapy. (Tr. 98, 122). Barlas received physical therapy, including electric stimulation of the mus-

cles in the lumbar region, hot packs, massage, strength exercises for the lower back, as well as a prescription for indomethacin. (Tr. at 99).

Barlas continued a regimen of physical therapy for a number of months, until, according to Dr. Goldberg, Barlas insisted that he return to work. Dr. Goldberg reluctantly authorized a qualified "fit for duty" in November 2000, and, when this was rejected by the plaintiff's union, an unrestricted order in December 2000. (Tr. at 101).

Dr. Goldberg re-examined Barlas in May 2002, and found that Barlas was "still injured." (Tr. at 105). Barlas was still experiencing lower back and leg pain and was unable to satisfactorily perform standard tests, such as leg raising and trunk flexation. Dr. Goldberg diagnosed him with chronic lower back derangement. (Tr. at 106–07). Barlas will continue to feel pain as a result of his injury, and his condition is expected to worsen as he ages, including the likely onset of traumatic arthritis in the area. (Tr. at 110–11). Additional physical therapy would not have helped Barlas, as, in general, one year after such an injury occurs, the maximum benefit from treatment will have been reached and maximum healing will have occurred. (Tr. at 109–10). Although there may have been some degenerative changes unrelated to the accident, Goldberg was confident that the trauma caused the herniated disc and a great deal

---

**2.** This was likely because, at the time of the accident, the most severe pain, from Barlas's ankle, overshadowed pain from his back, a phenomenon known as "extinction." (Tr. at 146–47).

**3.** Reviewing the same MRI, radiologist Dr. Mark Novick found no evidence of any acute, traumatic injury, and that Barlas "came as [he was]" with degenerative back problems at

the time of the accident. (Tr. at 178, 196). In light of the other evidence, I give this testimony little weight. Even Dr. Novick agreed that it was possible that the accident aggravated Barlas's condition, making it, for the first time, symptomatic—that is, causing pain, if not "radicular pain." (Tr. at 197–98, 203).

of continuing pain. (Tr. at 117, 125).[4]

Before Barlas was injured by his fall on the deck of the Cape Avinof, he complained of no back problems; now he reports lasting effects from the fall, including shooting pains down his right leg, extreme pain at times in his lower right back and leg, difficulty performing sexually, pain caused by sneezing and coughing, and a general discomfort. (Tr. at 30, 41–43, 158).

Before the accident, Barlas was a fit man who enjoyed playing basketball, bowling, jogging, fishing, and actively participating in the lives of his two children. Since the accident he is unable to play basketball, bowl, jog or even watch his daughter play volleyball, as standing in the gym for extended periods causes him pain. (Tr. at 37–41). Putting on his socks can at times be a struggle, and he must take additional time in the morning and after work to stretch in an effort to alleviate his discomfort. (Tr. at 43). Barlas is still able to fish; likewise, he returned to work as an AB in the merchant marine in March 2001, one year after the accident, although he now works with increased pain. (Tr. at 39, 42). Barlas has since obtained a permanent position as a seaman aboard the M/V Enterprise. (Stip. Facts ¶ 19).

### D. *Lost Wages and Compensation*

Barlas was paid in full for the remainder of the coastwise "voyage" of the docked Cape Avinof, and dismissed on March 20, 2000. (Tr. at 59; Stip. Facts ¶ 9–10). He received $8 per day for maintenance through November 19, 2000, an amount set by the Government's collective bargaining agreement with the National Maritime Union. (*Id.*). On November 20, 2000, Dr. Goldberg found Barlas "fit for a trial of work." The union refused to accept this qualified order, and thus Barlas was not cleared to work until Dr. Goldberg signed an unrestricted order on December 27, 2000. (Tr. at 119–120; PX 12, 14; Stip. Facts ¶¶ 15–17). This leaves an intervening 37 days (November 20, 2000 through December 27, 2000) for which he received no compensation, and thus he should have been paid an additional $296 in maintenance. (Stip. Facts ¶ 17). In addition, Barlas was unable to work for 9 months of the year 2000. His average salary from 1996–2001, excluding 2000, was $36,214; in 2000 Barlas earned only $3,638, or $32,576 less than average. (Stip. Facts ¶ 8).

### DISCUSSION and CONCLUSIONS OF LAW

### I. *Applicable Law*

#### A. *Jurisdiction and Prior Proceedings*

Barlas filed suit on July 17, 2001. Jurisdiction is proper under 28 U.S.C. § 1333. The Cape Avinof is owned by the United States and operated by its ship manager, Mormac Marine. The United States concedes to jurisdiction under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52. This case was tried to the Court on December 2–3, 2002. At trial, plaintiff withdrew his claim based upon negligence under the Jones Act, and proceeded solely with a

---

**4.** Neurologist Dr. Gerald Klingon found that any degenerative changes were in fact caused by the accident. (Tr. at 144–46; 167). In all other respects, Dr. Klingon confirmed Goldberg's diagnosis, as well as his prognosis for continued—and increasing—pain associated with Barlas's work. (Tr. 157, 161). Likewise, neurologist Dr. Gary Korenman, called by the Government, substantially concurred with Drs. Goldberg and Klingon, and radiologist Dr. Charles Pfaff. (Tr. at 234–35, 241, 245). Dr. Korenman concluded that Barlas was "mildly disabled" and should not be doing strenuous work. (Tr. at 246). I accept the testimony of Drs. Goldberg and Klingon.

claim of unseaworthiness under the general maritime law.

## B. *Liability for Unseaworthiness*

### 1. *The Nature of the Warranty*

■ The law of unseaworthiness has been described as a species of "strict liability" or even a "no fault doctrine." *Gravatt v. City of New York,* 226 F.3d 108, 116 (2d Cir.2000). Although some courts hesitate to equate unseaworthiness with strict liability—and here, the Government objects to the term (Tr. at 263)—it is well-settled that unseaworthiness is a strict liability rule. *See, e.g., Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 207–08, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996) ("State wrongful-death statutes proved an adequate supplement to federal maritime law, until a series of this Court's decisions transformed the maritime doctrine of unseaworthiness into a strict-liability rule.").

■ Technically, unseaworthiness stops short of absolute liability because it depends upon "reasonable fitness." Under the principles of seaworthiness, an owner has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Oxley v. City of New York,* 923 F.2d 22, 24 (2d Cir.1991). "[T]he concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question." *Mosley v. Cia. Mar. Adra, S.A.,* 314 F.2d 223, 227 (2d Cir.1963). An owner's failure to provide a ship, crew, and appurtenances reasonably fit for their intended service results in "a species of liability without fault," *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and such liability "does not depend either on negligence ... or on

notice." *Oxley,* 923 F.2d at 25 (citations omitted).

A ship is considered unseaworthy when it is "insufficiently or defectively equipped." *Waldron v. Moore–McCormack Lines, Inc.,* 386 U.S. 724, 726, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967) (footnote omitted); *see Poignant v. United States,* 225 F.2d 595, 598 (2d Cir.1955). There is liability without fault, because "unseaworthiness is a condition, and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it." *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

### 2. *The History of the Doctrine*

The rationale of the seaworthiness remedy is based upon "the hazards of marine service which unseaworthiness places on the men who perform it" coupled with "their helplessness to ward off such perils." *Sieracki,* 328 U.S. at 93, 66 S.Ct. 872. In apportioning the risks of maritime injuries, "the harshness of forcing [seamen] to shoulder alone the resulting personal disability and loss [has] been thought to justify and to require putting their burden, in so far as it is measurable in money, upon the owner regardless of his fault." *Id.* at 93–94, 66 S.Ct. 872.

Some of those risks are "avoidable," in that they result from negligence; those unavoidable risks of loss "beyond" negligence can be distributed "in the shipping community which receives the service and should bear its cost." *Id.* at 94, 66 S.Ct. 872; *see DeGioia v. U.S. Lines Co.,* 304 F.2d 421, 426 (2d Cir.1962) ("The function of the doctrine of unseaworthiness ... is allocation of the losses caused by shipboard injuries to the ... institutions most able to minimize the particular risk involved."); *The H.A. Scandrett,* 87 F.2d

708, 711 (2d Cir.1937) (A.Hand, J.) ("A ship is an instrumentality full of internal hazards aggravated, if not created, by the uses to which she is put. It seems to us that everything is to be said for holding her absolutely liable to her crew for injuries arising from defects in her hull and equipment. The liability can be covered by insurance and is better treated as an expense of the business than one left to an uncertain determination of courts in actions to recover for negligence.").

In addition, "admiralty courts have always shown a special solicitude for the welfare of seamen and their families," believing that "it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 36, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) (internal quotations omitted); *see Cortes v. Balt. Insular Line*, 287 U.S. 367, 377, 53 S.Ct. 173, 77 L.Ed. 368 (1932) ("Out of this relation of dependence and submission there emerges for the stronger party a corresponding standard or obligation of fostering protection.") (Cardozo, J.). Indeed, "no other worker in our society can invoke such powerful relief in the event of an industrial accident." Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6–8 (3d ed.2001).

Thus, the unseaworthiness remedy is "a form of absolute duty owing to all within the range of its humanitarian policy." *Sieracki*, 328 U.S. at 94, 66 S.Ct. 872. The remedy is not, however, a system of workers' compensation, and not every injury will result in liability for unseaworthiness. *See Hughes v. ContiCarriers & Terminals, Inc.*, 6 F.3d 1195, 1197 (7th Cir.1993) (Easterbrook, J.) ("Yet admiralty does not include a workers' compensation program parallel to the [LHWCA], which covers dock workers. Seamen did not give up the tort measure of damages and receive broader coverage in return."); *cf. O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 61–62 (2d Cir.2002) ("While land-based employees—including land-based maritime workers—typically can recover from their employers for work-related injuries only through scheduled no-fault compensation schemes, the Jones Act gives seamen an express right of action in tort because of their status as 'wards of the admiralty' who 'are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour.' ") (citation omitted) (quoting *Harden v. Gordon*, 11 F. Cas. 480, 485, 483 (C.C.D.Me.1823) (No. 6,047) (Story, J.)); *see also Reyes v. Delta Dallas Alpha Corp.*, 199 F.3d 626, 628–29 (2d Cir.1999) (noting that maintenance and cure is analogous to workers' compensation).

### 3. *The Requirement of a Defect*

The doctrine may thus be compared to the law of products liability: although unseaworthiness imposes liability without fault, "there must still be a defect in the vessel." *Hughes*, 6 F.3d at 1197; *see also Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir.1991) ("Accordingly, the seaworthiness issue is treated like a breach of warranty, rather than the narrower duty-breach inquiry for negligence claims."); *see also George v. Celotex Corp.*, 914 F.2d 26, 28–29 (2d Cir.1990) (citing *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932) (L.Hand, J.), a landmark unseaworthiness case, in the products liability context); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 274 (2d ed.1975) (expanding liability for unseaworthiness produced "results strikingly similar to those being achieved at the same time with respect to manufacturer's liability for defective goods").

Despite the fact that courts occasionally use the word "absolute" to describe the

duty, as in the products liability context, "strict liability has never been, and is not now, absolute liability" in the sense that "under strict liability the manufacturer does not thereby become the insurer of the safety of the product's user." *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162, 1166 (1978). "On the contrary, the plaintiff's injury must have been caused by a 'defect' in the product." *Id.* Thus, liability is "beyond negligence but short of absolute liability." *Id.; see Puddu v. Royal Netherlands S.S. Co.*, 303 F.2d 752, 757 (Hays, J., concurring) ("The difficulty with the concept of unseaworthiness arises from the fact that while the authorities hold that there is liability without fault, there is no case which holds that there is absolute liability. The situation demands, then, that without regard to fault, we fix a point short of absolute liability.").

As in products liability, where liability is only imposed for an unreasonably dangerous or defective product, here the "standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Trawler Racer*, 362 U.S. at 550, 80 S.Ct. 926. An owner is not "obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use." *Id.*

One such imperfection that does not create liability is that of a personal, negligent act of another seaman. An important distinction exists between "transitory unseaworthiness," for which liability exists, and "instant unseaworthiness," defined as a single act of "operational negligence" that does not result in liability. *Usner*, 400 U.S. at 496, 91 S.Ct. 514.

Nor is a seamen relieved of his burden of showing causation: "A seaman must show that an unsafe condition on the vessel caused his injury; dispensing with the need to prove that some 'fault' led to this condition does not dispense with the need to establish that there was one." *Hughes*, 6 F.3d at 1197. "[A]s we have many times said, the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy." *Mosley*, 314 F.2d at 228–29. The lower standard of causation familiar in Jones Act cases does not apply, and thus the plaintiff must show that the defective condition was a "substantial factor" in causing his injury. *Brown v. OMI Corp.*, 863 F.Supp. 169, 170 (S.D.N.Y.1994).

Further, "the rule of comparative negligence applies," *Jones v. Spentonbush–Red Star Co.*, 155 F.3d 587, 596 (2d Cir.1998); 2 Martin J. Norris, *The Law of Seamen* § 27:19 (4th ed.1985), and is measured by "'the traditional negligence standard of whether [the seaman] exercised the care which a reasonably prudent man would have exercised under the circumstances.'" *Brown*, 863 F.Supp. at 170–71 (quoting *Ktistakis v. United Cross Navigation Corp.*, 324 F.2d 728, 729 (2d Cir.1963)).

### C. *Maintenance and Cure*

■ "A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441, 121 S.Ct. 993, 148 L.Ed.2d 931 (2001). Maintenance and cure "extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery" or when a doctor diagnoses the particular injury as a permanent one.

*Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *see Calo v. Ocean Ships, Inc.,* 57 F.3d 159, 162 (2d Cir.1995); *Nasser v. CSX Lines, LLC.,* 191 F.Supp.2d 307, 316 (E.D.N.Y.2002). An admiralty court must be liberal in interpreting this duty "for the benefit and protection of seamen who are its wards." *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 529, 58 S.Ct. 651, 82 L.Ed. 993 (1938).

## II. *Application*

I discuss the application of the seaworthiness doctrine as follows. I begin by discussing whether the duty applies to the packaging of ship's stores. Next, I decide whether the warranty was breached by the presence of the strap on the deck of the Cape Avinof, either as defect in the strap or the deck, or both.

### A. *The Warranty Extends to Ships' Stores and Packaging*

As a preliminary matter, the Government suggests that there is an "initial question" of whether the warranty of seaworthiness applies to a "package, whether cargo or food stores." (Gov't Post–Trial Br. at 10). From ample authority, I conclude that the warranty extends both to ships' stores and to their defective packaging.

### 1. *Provisions Are Covered by the Warranty*

■ From its earliest expressions, adequate "provisions" have been a part of the implied warranty of seaworthiness. *See* 2 Norris, *supra,* § 27:7. In *Dixon v. The Cyrus,* 7 F. Cas. 755, 757 (D.Pa.1789) (No. 3930), the court held:

> But notwithstanding this silence of the articles, law and reason will imply sundry engagements of the captain to the mariners. Two of which are: First, that at the commencement of a voyage, the ship shall be furnished with all the necessary and customary requisites for navigation, or, as the term is, shall be found seaworthy; and, secondly, that the captain shall supply the mariners with good and sufficient provisions whilst they are in his service.

More recently, the Supreme Court described the scope of the duty in the broadest terms:

> *Trawler Racer* involved the defective condition of a physical part of the ship itself. But our cases have held that the scope of unseaworthiness is by no means so limited. A vessel's condition of unseaworthiness might arise from *any number of circumstances.* Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. *For any of these reasons, or others,* a vessel might not be reasonably fit for her intended service.

*Usner,* 400 U.S. at 499, 91 S.Ct. 514 (emphasis added; footnotes omitted). In one example of "any number of circumstances," the Court has held the duty applies to hand tools used aboard a ship. *See Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 331, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960) (finding evidence to create a jury question whether a wrench with a worn grip that slipped from a crewman's hand and injured his foot was unfit for its intended use). Accordingly, I conclude that defective provisions can render a ship unseaworthy.

### 2. *There Is No Reason to Exclude Packaging*

As for the packaging of ships' stores, I likewise find no reason to decline to extend the duty. For example, as for cargo, the

doctrine applies to conditions created by improper loading or stowage, but not to defective cargo itself. The Supreme Court directly addressed defective cargo containers in *Gutierrez v. Waterman S.S. Corp.* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), finding unseaworthiness could arise from defectively bagged beans:

> A ship that leaks is unseaworthy; so is a cargo container that leaks. When the shipowner accepts cargo in a faulty container or allows the container to become faulty, he assumes the responsibility for injury that this may cause to seamen or their substitutes on or about the ship. Beans belong inside their containers, and anyone should know, as the trial court found, that serious injury may result if they get out of their containers and get underfoot. These bean bags were unfit and thus unseaworthy.

373 U.S. at 213–14, 83 S.Ct. 1185. The Court noted the issue was not one of first impression. *See Gutierrez,* 373 U.S. at 212, 83 S.Ct. 1185 (citing cases including *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962), where "a longshoreman was injured when a bale of burlap cloth fell on him because the metal bands wrapped about the bales broke while the bales were being hoisted").

There is also Second Circuit authority concerning defective cargo containers. In *Reddick v. McAllister Lighterage Line Inc.,* the court held a longshoreman could recover for a fall caused by stepping onto a weak board on a wooden crate, noting that "unseaworthiness may also be predicated on the latent defect in the cargo-crate." 258 F.2d 297, 299 (2d Cir.1958); *see Avena v. Clauss & Co.,* 504 F.2d 469, 471 (2d Cir.1974) (finding unseaworthiness could result from defect in steel strap securing carton).

Judge Friendly addressed the issue in *Noble v. Lehigh Val. R. Co.,* 388 F.2d 532 (2d Cir.1968). Noble was struck by a piece of wood that fell while a crate was suspended above the deck of the Hellenic Sailor. The trial judge instructed the jury to determine "whether the wood which struck the plaintiff came from 'the lifting part of the container,' the skids and pallet, or rather from some other part of the container, i.e., the crating material or the chocks; the warranty would attach upon the first finding but not upon the second." *Id.* at 533. The Second Circuit rejected this distinction between the ship's appliances—where the warranty was breached if the wood came from a "lifting device"—and cargo containers, finding *Gutierrez* to be broadly controlling on "the law with respect to containers," and not just cargo stowage or unloading. *Id.* at 533–34; *see also Castorina v. Lykes Bros. S.S. Co.,* 578 F.Supp. 1153, 1162 (S.D.Tex.1984) (examining the "fine distinction [that] is drawn between cargo and packaging," noting only cargo itself (such as asbestos packed in burlap bags) is exempt from the warranty).

Further, in *Martinez v. Sea Land Servs. Inc.,* 763 F.2d 26 (1st Cir.1985), then-Circuit Judge Breyer held that a vessel could be made unseaworthy when a plastic sleeve securing a box of soft drinks came loose, causing the crewmember carrying it on his shoulder to twist his back. The First Circuit ruled that "the seaworthiness warranty of 'fitness for duty' extends to material in which ships' stores are wrapped." *Martinez,* 763 F.2d at 27. Judge Breyer noted that although " 'ships' stores' cases have not arisen often, at least one district court has explicitly held the seaworthiness warranty applicable to their wrapping material." *Id.* (citing *Wilson v. Twin Rivers Towing Co.,* 413 F.Supp. 154, 158–59 (W.D.Pa.1976) (finding box of meat "too heavy and improperly packaged")).

This conclusion is supported by the "rough sort of justice" of risk-apportionment that underlies unseaworthiness liability. In *Martinez*, 763 F.2d at 27, Judge Breyer cites a cargo-loading case from the Fourth Circuit on this point:

Fault is not an essential element of the doctrine of "unseaworthiness" but conceptually and theoretically it may rest upon an irrebuttable presumption of opportunity to prevent harm. Once goods are put aboard, the condition of containers and packaging are within the control of the master of the vessel, and in most instances, although not all, defective packaging is discernible by inspection. If most defects are ascertainable it is a rough sort of justice and not intolerable to assume that all are. Thus it is possible to say that the no-fault concept of unseaworthiness rests in part, at least theoretically, upon the ship's "fault" in failing to discern and correct conditions that may cause injury.

*Pryor v. Am. President Lines*, 520 F.2d 974, 981 (4th Cir.1975) (footnote omitted). *Martinez* also cites several First Circuit cases, that, like *The Cyrus*, list ships' stores as subject to the warranty, as well as 46 U.S.C. § 10902, the statutory remedy for unseaworthiness that applies to the ship's "crew, hull, equipment, tackle, machinery, apparel, furniture, provisions of food or water, or stores."

The only recognized exception to the reach of the seaworthiness doctrine is where—like the gathering of insecticide fumes in the ship's hold in *Morales v. City of Galveston*, 370 U.S. 165, 171, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962)—"[W]hat caused injury ... was not the ship, its appurtenances, or its crew, but the isolated and completely unforeseeable introduction of a noxious agent from without." This exception for inherently defective or dangerous cargo does not apply here. Defec-

tively packaged stores are not foreign agents—they are essential items taken on board as part of the "adventure" to sustain the ship's crew. *See Peterson v. Great Hawaiian Cruise Line, Inc.*, 33 F.Supp.2d 879, 885 (D.Haw.1998) (finding unseaworthiness when seaman injured as he stepped down on wooden pallets that flipped under his weight, as "the wooden pallets ... became part of the ship when they were placed on the bow"); *cf. Elmadari v. Bell S.S. Co.*, No. 5–96–183 JRT/RLE, 1998 WL 1285336, at *2 (D.Minn. 1998) (holding exercise equipment that tripped plaintiff, brought on board for a crew member's personal use, was an outside agent, not an appurtenance despite being attached to a ship's door with a wing-nut). I find the reasoning in *Martinez* persuasive, and I conclude that the warranty of seaworthiness extends to the packaging of a ship's stores.

## B. *The Warranty Was Breached*

I conclude that the presence of the uncut packing strap on the deck of the Cape Avinof amounted to a breach of the warranty of seaworthiness. I discuss this conclusion as follows. First, as a preliminary matter, I consider the doctrine's application to temporary conditions—oil, grease, and other obstructions on deck. Second, I discuss the element of time. I conclude that, notwithstanding the short time that the strap lay on the deck, its presence was both the result and the cause of a defect that caused Barlas's injuries.

### 1. *Applying the Warranty to Temporary Conditions*

In the realm of temporary, transitory, or momentary unseaworthiness—"soap, oil, grease, jello or what not on floor, deck, or steps," Gilmore & Black, *supra*, at 400—the difference between the general maritime and the shoregoing law is striking.

Here, the law of the sea exerts a different pull, and we must readjust.

The first reorientation is simple. When we say "seaworthy" here, contrary to what the word means to the rest of the world, we do not mean "fit to traverse the seas." *American Heritage Dictionary of the English Language* (4th ed.2000). Unseaworthiness is a "condition," and there is no restriction on its magnitude so long as it disrupts something about the ship's fitness for service. *See* Note, *The Doctrine of Unseaworthiness in the Lower Federal Courts*, 76 Harv. L.Rev. 819, 820 (1963) ("An unseaworthy condition can be found in almost anything, no matter how trivial, that causes injury.") (citing *Krey v. United States*, 123 F.2d 1008, 1010 (2d Cir.1941) ("Viewed as a shower to be used at sea, the absence of any sort of handle or rail for support is alone almost enough to condemn it.") (Clark, J. on a panel with A. & L. Hand, JJ.)); *Manigault v. United States*, 316 F.Supp. 688, 689, 691 (E.D.Pa. 1970) (finding broken glass in sink rendered ship unseaworthy, when steward was aware of the glasses' fragility and negligently failed to replace them).

The second reorientation is the "complete divorcement of unseaworthiness liability from concepts of negligence." *Trawler Racer*, 362 U.S. at 550, 80 S.Ct. 926. This correction is easier said than done, for liability is not quite absolute—perfection is not required—and yet it does not depend upon fault or foreseeability, notice or constructive notice, control or reasonable care. *See, e.g., Oxley*, 923 F.2d at 25; *Ezekiel v. Volusia S.S. Co.*, 297 F.2d 215, 218 (Clark, J., dissenting) ("It seems very difficult for courts to accustom themselves to the strict liability of unseaworthiness, perhaps because it is cut on such a different pattern than the familiar negligence action.... Blameless he may be; nevertheless he is liable."). Grounding

concepts central to a slip and fall on land do not apply. The blackened banana peel showing constructive notice, familiar from generations of torts casebooks excerpting *Moore v. Winn–Dixie Stores, Inc.*, 252 Miss. 693, 173 So.2d 603, 604 (1965), is of no use. (*See* Pl. Post–Trial Br. at 5; Tr. at 2). In "[p]erhaps the clearest expression" of the warranty, *Trawler Racer*, 362, U.S. at 548, 80 S.Ct. 926, Judge Augustus Hand held liability will lie "even though there was no means of anticipating trouble" and thus a "ship is not freed from liability by mere due diligence to render her seaworthy." *The H.A. Scandrett*, 87 F.2d at 711.

In fact, as has been suggested, the "divorcement" from concepts of negligence is not as complete as *Trawler Racer* implies. Negligence may creep in via "reasonable fitness," such that the initial determination of what is and is not a "defect" making the ship unfit for service becomes a question of whether those responsible acted with "reasonable care" under the circumstances. *See Earles v. Union Barge Line Corp.*, 486 F.2d 1097, 1105 (3d Cir.1973) (noting "there is a great hazard" that a jury will conflate "reasonably suitable" with negligence and "get the impression that all is to be tested by one gauge") (quoting *Cox v. Esso Shipping Co.*, 247 F.2d 629, 637 (5th Cir.1957)); *Ballwanz v. Isthmian Lines, Inc.*, 319 F.2d 457, 461 (4th Cir.1963) (finding error in a jury charge that repeated the words "reasonably," "reasonable," and "unreasonable," as the "repetitive insistence that the equipment need be only reasonably fit" was "tantamount to suggesting a requirement that the jury must find negligence").

Some language and reasoning from the negligence context still must be used, although the "use—in a field of liability without fault—of words commonly applied to negligence actions, has vexed the courts."

*Marshall v. Ove Skou Rederi A/S,* 378 F.2d 193, 198 n. 6 (5th Cir.1967). As the Fifth Circuit observed, even the Supreme Court's "own standards ... necessarily embrace phraseology and analyses that concurrently exist in negligence law." *Id.* (citing as an example the "forseeability" inquiry in *Morales,* 370 U.S. at 171, 82 S.Ct. 1226, where the injury was caused by "the isolated and completely unforeseeable introduction of a noxious agent from without"). In *Marshall,* the court suggested an approach where, once a defective condition is found, "the carrier's care, or lack of it, has no play in insulating him from liability, or mitigating his fault." Courts may nonetheless use "methods of analysis, and language, concurrently used in negligence cases" for "the initial determination—answering the threshold question whether the condition is unseaworthy as not reasonably fit." *Id.* In other words, "[d]istinctions which in common sense are relevant to a determination of seaworthiness do not become irrelevant because they are relevant also to negligence." *Id.*

Here, the essential question—whether the hazard presented by the fallen packing strap was significant enough to disrupt the fitness of the deck of the Cape Avinof—is one of magnitude, and the question has two related aspects. One aspect is duration, but in light of the law of seaworthiness, it is unclear whether the length of time the strap lay on the deck is material. A second aspect is whether, without regard to time, the dropped packing strap rendered the deck unsafe, or whether Barlas should have been able to cope with the strap or similar hazards as an ordinary part of any unloading operation.

### 2. *The Element of Time: May the Duration of the Condition Be Considered?*

In the transitory seaworthiness context, one notion that strains against the moorings of the doctrine's requirement of liability without fault is the concept of notice. The Government insists that the "duration of the condition" must be considered as part of the "reasonable fitness" test. (*See* Gov't Post–Trial Br. at 16). But consideration of time would seem to reintroduce a requirement of notice. *See Puddu,* 303 F.2d at 757 (Hays, J., concurring) ("But logical coordinates for fixing a point [short of absolute liability], such as the time during which a particular condition continues to exist, are entirely lacking. Time is obviously irrelevant since notice to the shipowner is of consequence only if his liability is limited by fault."). In contrast, Barlas insists that duration is irrelevant, and argues that if the strap would be deemed a hazard if it lay on the deck for days, then it was a hazard as soon as it was dropped. (Pl.'s Supp. Post–Trial Br. at 10).

In light of Supreme Court and Second Circuit precedent, I conclude that although duration may be considered, the absence of notice does not preclude a finding of unseaworthiness.

Any discussion of transitory unseaworthiness must begin with the seminal Supreme Court case of *Mitchell v. Trawler Racer,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). Mitchell had slipped when he climbed onto the rail to reach a ladder attached to the pier in Boston. *Id.* at 540, 80 S.Ct. 926. The Court held that the Racer could have been rendered unseaworthy by the presence of fish slime on the rail from an earlier unloading operation regardless of whether the shipowner had notice of the condition. The majority did not hold explicitly that the length of time the slime had been present was immaterial, saying only that "liability for a temporary unseaworthy condition is [no] different from the liability that attaches

when the condition is permanent." *Id.* at 550, 80 S.Ct. 926.[5] In reversing a judgment in favor of the shipowner, however, the Court necessarily rejected the lower courts' reasoning that liability turned on whether the shipowner had a reasonable opportunity to discover the defect and remove it. *See Mitchell v. Trawler Racer,* 167 F.Supp. 434, 435 (D.Mass.1958) ("A reasonable period of time must elapse to allow the defendant shipowner to discover the deposit."); *Mitchell v. Trawler Racer,* 265 F.2d 426, 432 (1st Cir.1959) ("[I]t seems a hard doctrine to say that the shipowner, however great his duty of care, should be liable for injuries occasioned thereby even before ... a reasonable opportunity to discover the defect and remove it.") (adopting the reasoning of the majority in *Cookingham v. United States,* 184 F.2d 213 (3d Cir.1950)).[6]

Second Circuit case law confirms that unseaworthiness does not depend on notice of a defect. In *Poignant v. United States,* 225 F.2d 595 (2d Cir.1955), a stewardess slipped on what was probably an apple peel in a passageway of the S.S. Marine Flasher, then docked in Germany. 225 F.2d at 596. The source of the apple peel was not known. The corridor was "not littered" with garbage, but the vessel did not have garbage chutes—the crew simply pulled cans of garbage from the galley to the ship's rail and dumped them overboard. *Id.* The trial court found that the failure to show notice of the hazard was fatal to the plaintiff's negligence claim, dis-

missing the unseaworthiness claim without further discussion. *Id.*

The Second Circuit reversed, holding squarely that unseaworthiness did not depend upon notice. The court considered "the main problem in the case" to be one of the magnitude of the condition—whether an apple peel in a passageway could ever amount to unseaworthiness, as the "standard is not perfection but reasonable fitness." *Id.* at 598. Rather than find, as a matter of law, that debris in a passageway was a usual and customary risk aboard a ship—a peril of sea—the *Poignant* court concluded that a ship "does not become unseaworthy by reason of a temporary condition caused by a transient substance if even so the vessel was as fit for service as similar vessels in similar service." *Id.* The court remanded for consideration of (1) whether "the absence of garbage chutes on the vessel was the proximate cause of the accident" and (2) whether "comparable vessels generally are provided with such chutes." *Id.*

Soon after *Trawler Racer,* the Second Circuit considered a jury charge in another instructive slip and fall case that went to trial just before that decision issued. *Pinto v. States Marine Corp. of Del.,* 296 F.2d 1, 3 (2d Cir.1961).

In *Pinto,* Judge Weinfeld had charged the jury that "[u]nseaworthiness is a relative concept" and the jury should "bear in mind that the accident occurred on the ladder leading to and from the engine room, where the use of oil and grease is

---

**5.** The dissent drew out some of what was implicit, noting that it "appears that the spawn was deposited on the rail shortly before the injury" and characterizing Mitchell's position as holding the ship liable if "the presence of spawn on the rail" rendered the ship unfit "without more—and particularly without regard to the length of time the spawn had remained on the rail." *Id.* at 553 (Frankfurter, J., dissenting).

**6.** In *Cookingham,* a cook on the Rufus W. Peckham "slipped on a substance, apparently Jello, while going down a stairway." 184 F.2d at 214. "There was no evidence as to when or how the substance got on the step" and the court refused to extend liability to the shipowner without proof of his knowledge, control, or opportunity to correct the condition. *Id.* at 215.

required for normal engine room functioning." In this context, he charged, "the mere momentary presence of oil in the area does not in and of itself render the vessel unseaworthy." *Id.* Judge Weinfeld instructed that "it is not required that the vessel have a crew member handy with a rag to wipe off oil the very minute it is placed in an area" if the ship was as reasonably fit as similar vessels. *Id.* at 4.

In approving the charge, Judge Friendly noted that in *Trawler Racer,* "the Court was at pains to make clear that it was not going to the extreme of requiring any such absolute freedom of all parts of a vessel from all foreign substances at all times." *Pinto,* 296 F.2d at 5. Judge Friendly viewed the *Trawler Racer* holding narrowly, in the context of settling the once-raging debate about the difference between initial seaworthiness—the condition of the ship when it left port—and "transitory seaworthiness"—technically describing conditions that arose during the voyage, when presumably the shipowner would have less opportunity to correct the defect, and thus should be held to a lower standard of (reasonable) care:

> The Court's decision that it was inconsequential, as a matter of law, that the dangerous condition did not arise until a moment after the sailing did not logically carry with it a conclusion that it was similarly inconsequential, as a matter of fact, that the condition arose only a moment before the accident; whether such a momentary condition would or would not render the vessel unseaworthy would be for the trier of the facts to say.... A conclusion that liability

for a temporary condition is not different in legal nature from liability for a permanent one does not mean that the duration of the condition, the measures prescribed for dealing with it, and the feasibility of achieving perfect safety at all times, are irrelevant to deciding whether the owner had met his obligation to furnish "a vessel reasonably suitable for her intended service."

*Id.* Judge Friendly concluded that "[m]ost jurors would see a difference in the seaworthy condition of a vessel whose rails had been left coated with slime and gurry for hours, and of another, generally spick-and-span, on which a mishap had suddenly created a slippery condition. Must they be told that this distinction, relevant in common sense, is irrelevant in law?" *Pinto,* 296 F.2d at 5–6. The court read *Trawler Racer* to hold that a jury "may nevertheless hold the owner liable in the latter case, not that they must." *Id.* at 6.[7]

Thus, duration is a factor that may be considered. Under *Pinto,* if a condition arises immediately before an accident, a finding of unseaworthiness is not required, but it is certainly permitted if the condition nonetheless amounts to unfitness. Indeed, that some element of time is incorporated into unseaworthiness can be seen in the contrast between transitory and so-called instant unseaworthiness due to "operational negligence," which the Second Circuit has described "as a 'single act of negligence which [does] not of itself create a condition longlasting enough to constitute unseaworthiness.'" *Calo,* 57 F.3d at 161; *see Puddu,* 303 F.2d at 757 (Hays, J., concurring) ("A ship is not unseaworthy

---

7. *Pinto* expressly disagreed with "some language" in *Grzybowski v. Arrow Barge Co.,* 283 F.2d 481, 485 (4th Cir.1960), presumably because that case interpreted Mitchell as holding that it was "immaterial ... how long [the slime] had been there." The dissent in *Pinto* objected that this analysis "import[ed] a time

element into the concept of seaworthiness which time element was rejected by the Supreme Court in [*Mitchell*]," and reasoned that that if grease made the step "unfit for use ... [i]t makes no difference whether the grease was there seconds or hours." *Pinto,* 296 F.2d at 8 (Smith, J., dissenting).

because it has glass in a window which might be broken. The injuries of a seaman who negligently breaks such a glass are not the result of unseaworthiness, nor are the injuries of a seaman who is cut by the falling glass. But injury incurred in stepping on the broken glass does result from unseaworthiness."). Duration must be considered to determine if the condition is "long-lasting" enough to be distinct from some source of operational negligence.

Here, the evidence shows that the strap was not laying on the deck for very long, and this fact weighs against a finding of unseaworthiness. Indeed, if the strap had been cut, or if Barlas tripped on some other piece of packaging debris that was part of the normal process of unloading stores, the momentary presence of such debris would not compel a finding of unseaworthiness.

In this case, however, the strap was not cut, and as can be seen by handling the exhibit and by the testimony of Barlas and Bolster, the strap posed an unusual and significant tripping hazard—even though it was present for only a short period of time.

### 3. *The Element of Magnitude: Was the Deck of the Cape Avinof Unsafe?*

As for this aspect, magnitude, the question is also a close one. On one hand, perfection is not required. On the other, transient substances and other apparently slight conditions routinely support findings of seaworthiness. *See* Norris, *supra,* § 27.21 ("It is now settled by the Supreme Court's holding in *Mitchell v. Trawler Racer, Inc.* that a so-called 'transitory' condition (as the temporary presence of oil, water or other foreign substance) of a vessel will make the ship unseaworthy as does a permanent defect.") (footnote omitted); *The H.A. Scandrett,* 87 F.2d at 708

(affirming jury finding that doorknob that gave way, causing plaintiff to fall, was unseaworthy). The warranty doubtless applies here in the case of a packing strap entangling a seaman's feet: "It has often been held that dangerous and uncertain conditions underfoot may constitute transitory unseaworthiness." *Shenker v. United States,* 322 F.2d 622, 625–26 (2d Cir.1963) (citing cases and discussing plaintiff who tripped over a "random object" after "unexpectedly stubb[ing] his toe against a piece of dunnage—a plank of lumber").

To begin, it is clear that reasoning backward from the fact of Barlas's injury is not enough. The shipowner is not an insurer absolutely liable for all injuries. In *Blier,* 286 F.2d at 923, the appeals court noted that "[a]ppellant seems to think that all the seaman must establish to warrant a recovery in this case is that there was grease on the gangway and that he slipped on that grease and was injured." The court continued: "In effect he says: grease is slippery, and, if grease was on the gangway and appellant slipped on it, he is ipso facto entitled to recover, as the vessel must have been unseaworthy." *Id.* The court cautioned that this was not "the teaching of *Mitchell,*" which did not demand "an accident-free ship," but merely one "reasonably fit for [its] intended use." *Id.*

In *Colon v. Trinidad Corp.,* the plaintiff "fell on a slippery portion of a deck passageway." 188 F.Supp. 97, 99 (S.D.N.Y. 1960). The court—not persuaded by the plaintiff's "confused and conjectural" account—concluded that reasonable fitness means that "a seaman is not absolutely entitled to a deck that is not slippery. He is absolutely entitled to a deck that is not unreasonably slippery." *Id.* at 100. The court went on that "[i]t seems only fair that men who make their livelihood on the water can be expected to cope with some

of the hazardous conditions that must prevail even on a seaworthy vessel. Any stricter rule would require the intervention of traveling companions to guide and protect sailors in going about the vessel to perform their duties." *Id.*

In *Rice v. Atlantic Gulf & Pac. Co.*, 484 F.2d 1318 (2d Cir.1973), the plaintiff slipped on an oily metal stairway leading to the main deck. The trial judge found no proof of unseaworthiness. The Second Circuit reversed, but cautioned that it was not holding that "every case where a seaman claims injuries as the result of slipping on oil or grease must as a matter of law be submitted to the jury," as there are circumstances where oil accumulation is normal, and a "seaman is not entitled to a deck or ladder that is free of all oil or grease." *Id.* at 1321.

In other words, only "unreasonable oil" or "unreasonable slipperiness" will render a deck defective. Presumably, in some circumstances, some amount of oil—or water or other like substances—is an ordinary "peril of the sea" that seamen must cope with, unless reasonable safety is disturbed. *See Rodriguez v. Coastal Ship Corp.*, 210 F.Supp. 38, 44 (S.D.N.Y.1962) (finding oil that had accumulated from morning until afternoon rendered vessel unseaworthy, as it was the "duty of officers to cause its removal either by placing sawdust or a chemical absorbent material thereon" and "the vessel was also unseaworthy because it lacked adequate devices or appurtenances to minimize or arrest the drippings"); *Calo*, 57 F.3d at 161; Gilmore & Black, *supra*, at 400 (discussing when "[c]ases of 'transitory unseaworthiness'— soap, oil, grease, jello or what not on floor, deck, or steps—might be regarded as normal 'perils of the sea' ").

An uncut packing strap, however, is different from grease, oil, soap, or water. *Cf. Gapay v. Q & S Enterprises, Inc.*, 133 F.Supp.2d 1139, 1143 (D.Alaska 2000) ("The crew ... had spent much of the night prior to the day of the accident chopping ice off the deck using crow bars, metal baseball bats, and teflon mallets.... The accumulation of ice on the boom of the crane on the vessel ... is not a peril of the sea."); *Lind v. American Trading & Production Corp.*, 294 F.2d 342, 345 (9th Cir. 1961) ("[T]he performance of soogeeing by crew members in and of itself cannot render a vessel unseaworthy. It is a necessary, normal and recurring seaman's duty, and work that must be done on board and which is customarily done while the vessel is at sea, causing the deck within the working area to become necessarily slippery, with footing thereon unsteady, and requiring the seaman to be alert as to his footing."); *Rogers v. Gracey–Hellums Corp.*, 331 F.Supp. 1287, 1289 (E.D.La.1970) (noting there are "certain hazards which are ordinary, and not unreasonable" including "when even reasonably fit metal tools strike one another or some other metal object, slivers are apt to fly").

Here, the packing strap itself was defective—as can be seen by the fact that it slipped from its carton and landed on the deck. Although a cut packing strap may be an expected piece of debris, an uncut strap—with its greatly increased potential as a tripping hazard—is per se defective. A circular, uncut packing strap is unlike a routine accumulation of oil or grease or other substances whose presence is to be expected. Indeed, both Barlas and Bolster testified that the strap was a hazard, one that should have been reported or removed. That the deck should be kept clear of tripping hazards and that the strap was defective are beyond dispute.[8]

**8.** *See Petterson v. Alaska S.S.*, 205 F.2d 478, 479 (9th Cir.1953) (applying a doctrine "simi-

Although "[w]e no longer live in an era when seamen and their loved ones must look primarily to the courts as a source of substantive legal protection from injury and death," *Miles*, 498 U.S. at 27, 111 S.Ct. 317, those deferential principles still animate the law of liability for unseaworthiness. *Rice*, 484 F.2d at 1321 (evaluating testimony and noting that "[w]e must keep in mind the liberal attitude displayed toward unseaworthiness claims such as the present one"). I conclude that the presence of the uncut strap on the deck of the Cape Avinof was both the result of a defect—coming loose from its carton—and rendered the deck defective, or temporarily unsafe, and unfit for the operation of unloading stores.

### III. *Damages*

In setting damages, I have taken into account Barlas's physical injuries, associated discomfort, inconvenience, pain and suffering, and the economic losses he has sustained to date and will suffer in the future.

■ As for comparative negligence, I find that Barlas bears twenty percent of the responsibility for the accident, as he failed to observe and avoid the strap. *Cf. Passantino v. States Marine Lines, Inc.,*

299 F.Supp. 1252, 1255 (S.D.N.Y.1969) (finding, where a safe walkway existed, accident was caused "solely by [plaintiff's] own negligence" because he did not "make reasonable use of his senses and intelligence to discover dangers to which he was or might be exposed").

I have also taken into account that the Government has paid Barlas maintenance and cure. I find that Barlas reached maximum cure on December 27, 2000, when he was declared fit for work without restrictions. Any further treatment that Barlas might require would be palliative, not curative in nature. *See Calo*, 57 F.3d at 162. Although the Government may be responsible for some additional expenses theoretically owing to cure, no evidence of additional expenses after December 27, 2000 is in the record.

I will award Barlas damages for (a) economic losses, consisting of (i) past lost earnings and (ii) future lost earnings, and (b) noneconomic losses, consisting of (i) past injuries, conscious pain and suffering, and loss of the enjoyment of life, and (ii) future injuries, conscious pain and suffering, and loss of enjoyment of life, as follows.

lar" to res ipsa loquitur: "If the block was being put to a proper use in a proper manner, as found by the district judge, it is a logical inference that it would not have broken unless it was defective—that is, unless it was unseaworthy."), *aff'd*, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) (per curiam); *Avena*, 504 F.2d at 471 (noting defect in steel strap securing 300-1b. cardboard carton could be found without showing *why* the strap snapped, cutting plaintiff's hand and causing him to fall, when crucial issue was whether pulling the carton with hook was intended use); *Oliveras v. Am. Exp. Isbrandtsen Lines, Inc.*, 431 F.2d 814, 816 (2d Cir.1970) ("Nothing more need be shown except that the device in question failed under conditions when it should have functioned properly. On the

issue of the ship's unseaworthiness it is of no moment to speculate as to why the hook and wedge, fittings intended to keep the sliding door open, failed to function."); *see also Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir.1993) ("Where a ship's equipment malfunctions under normal use"—an unsecured hatch cover fell on the plaintiff as he went up a ladder—"the trier of fact may infer that the equipment is defective. This is especially so where, as here, no evidence supports an alternative explanation for the malfunction.") (citations omitted); *cf. Tanzi v. Deutsche Dampfschiffahrts–Gesellschaft Hansa*, 355 F.Supp. 432, 434 (S.D.N.Y.1973) (finding plaintiff failed to meet burden of proof that metal strap was defective merely because it snapped while he was moving the box).

For past lost earnings, I award $32,576. This is based upon the amount that Barlas earned in 2000 below his average earnings as a seaman. Not including the year 2000, he earned an average of $36,214 during the period 1996–2001, and in 2000 he earned only $3,638. I do not award lost earnings for any other period through the date of trial. Although Barlas is entitled to some additional maintenance, as I am awarding lost wages, maintenance—traditionally, payment for food and lodging during convalescence—would amount to a double recovery here. When the award of $32,576 is reduced by the $1,728 of maintenance paid, it amounts to $30,848.

For future lost earnings, I award $100,000. This amount is based upon the fact that, although Barlas is able to work, he will not be able to do so for the full extent of his work-life expectancy. Barlas has approximately 14 years remaining of labor force participation, and according to Barlas and expert testimony, he will be unable to work that long and not to the same extent. I have factored in discounting to present value. *See McCrann v. U.S. Lines, Inc.,* 803 F.2d 771, 773 n. 1 (2d Cir.1986).

As for noneconomic losses, for past pain and suffering, I award $90,000, and for pain and suffering in the future, I award $70,000.

As noted, the total of $290,848 must be reduced by twenty percent to account for Barlas's comparative fault, leaving a final award of $232,678.40. Viewed as a whole, the total award is within a reasonable range for similar injuries under similar facts. *See Bachir v. Transoceanic Cable Ship Co.,* No. 98 Civ. 4625(JFK), 2002 WL 413918, at *11 (S.D.N.Y. Mar. 15, 2002) (citing cases and deriving range of pain and suffering awards of approximately $225,000 to $2,000,000).

**CONCLUSION**

The Clerk of the Court shall enter judgment in favor of plaintiff Eduardo Barlas against the United States in the amount of $232,678.40, with costs.